# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 15, 2025

Lyle W. Cayce
Clerk

No. 24-70007

ELIJAH DWAYNE JOUBERT,

*Petitioner—Appellant,*

*versus*

ERIC GUERRERO, *Director, Texas Department of Criminal Justice, Correctional Institutions Division,*

*Respondent—Appellee.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:13-CV-3002

Before JONES, DUNCAN, and DOUGLAS, *Circuit Judges.*

EDITH H. JONES, *Circuit Judge:*[*]

Elijah Joubert was convicted of capital murder and sentenced to death for his involvement in the attempted robbery and murder of a check cashing store employee and a policeman. Joubert seeks a certificate of appealability ("COA") on three claims challenging the district court's denial of his 28

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

U.S.C. § 2254 petition for habeas corpus relief. This is a most unusual case in that the defendant himself advanced the very same false evidence, implicating an innocent third man in the crimes, that he accuses the government of introducing. In a simpler legal world, one might think that "unclean hands" prevents the defendant from profiting by chastising another party for his identical misdeed. But the world isn't simple. We deny a COA.

## I.

In April 2003, Joubert participated in a robbery-turned-murder at a check cashing business that resulted in the deaths of store employee Alfredia Jones and Houston Police Department Officer Charles Clark. Three people were arrested in connection with the robbery and murders: the petitioner Elijah Joubert, Alfred Brown, and Dashan Glaspie. Joubert confessed during an interrogation to his involvement in the robbery. Joubert maintained throughout the interrogation that he did not shoot Jones or Clark. But he laid out a detailed narrative of the sequence of events culminating in their murders, and he admitted to initiating and participating in the robbery knowing that someone might die.

On the morning of the robbery, Joubert said that Glaspie picked him up in Glaspie's girlfriend's car. Joubert said that Brown was also in the car. Joubert said that Brown and Glaspie each had a gun. The three men then drove to the first business they intended to rob. When they arrived, Joubert and Brown canvassed the store, but returned to their vehicle when they noticed a store employee had a gun. The three men then left the store, and Brown recommended that they rob a different store.

Joubert told police the trio then went to a second check cashing business. There, Joubert initiated the robbery. Joubert explained what he did when he saw Jones walk to the entrance of the business to open it for the

No. 24-70007

day: "All I do I run up on her, she let us in.  She let me and her in I ain't, I ain't got no gun I just run up with my hand in my coat like I got a gun."  Jones let Joubert into the store.  Joubert said he told Jones, "[w]e ain't gonna hurt ya all we want is this money[,]" but Jones then "kept on complaining" that "[s]he got kids or whatever."  Joubert said he let Brown into the store, and Glaspie soon followed.  Joubert said that both Brown and Glaspie had their "gun out."  Joubert told the police:

> I'm trying to let [Jones] know we just getting money up and nothing going to happen to you.  Cause I'm already knowing if some laws show up what's fixing to happen to her.  I'm already knowing. . . .  If I, if I'd had the gun she wouldn't of got shot. . . .
>
> But so when [Glaspie] came in I already knew that's why I was trying to tell [Jones], "give it up", because if the laws come she, she gonna die I already knew this.

As Jones "was acting like she couldn't get in the safe[,]" Officer Clark arrived at the scene and entered the store.  Joubert said that Officer Clark fired one shot before Brown shot him.  Joubert said that he then told Glaspie, "let's go," and Glaspie, who had been holding Jones by the back of the neck, shot her.  The three men fled the store.

Joubert's statement was not the State's only evidence tying Joubert to the crime.  For example, a witness testified that, before the robbery, she saw Joubert, Glaspie, and Brown together in Joubert's apartment complex.  She saw Glaspie load bullets into a pistol magazine and say, "[a]re y'all ready to go do it[?]"  Another witness testified that she saw Joubert, Glaspie, and Brown near where they abandoned the first robbery.  Another witness told jurors that Glaspie and Brown entered a nearby store before walking to the check cashing store, and his colleague soon heard gunshots.  Another witness saw three men run out of the check cashing store, presumably after the murders.  The defense's only witness testified that Joubert, Glaspie, and

No. 24-70007

Brown came to his apartment after the crime. The witness overheard Glaspie on the telephone say, "[s]hit, bitch got out of line. She was taking too long so I had to do what I had to do." The witness took that to mean Glaspie "had to shoot her."

Glaspie turned state's evidence and testified against Joubert and Brown in their separate trials. He was charged with aggravated robbery and given a thirty-year sentence in exchange for his testimony. Glaspie's testimony during Joubert's trial largely aligned with witness testimony and Joubert's confession. As with Joubert's confession, which the jury heard, Glaspie testified that the three men committed the robbery. Like Joubert, he testified that Brown shot Officer Clark. Glaspie and Joubert disagreed, however, over which of them murdered Jones. No evidence shows who shot the victims; the jury only had the contradictory testimony of the two participants to the robbery.

Given Joubert's admission of his involvement in the robbery and the witnesses' testimony, the defense argued at trial that Joubert was "involved in the robbery," but did "not . . . kill[] anyone." The jury convicted Joubert of capital murder.

The State sought the death penalty and presented evidence to the jury during the penalty phase of the trial that laid bare Joubert's extensive criminal history. At fourteen, Joubert was convicted as a juvenile for aggravated assault with a deadly weapon and for unlawfully carrying a weapon. That same year, Joubert assaulted a thirteen-year-old girl. Less than one year later, he participated in an armed robbery of a grocery store where an employee was shot. He was convicted as a juvenile for the robbery, as well as possession of cocaine and marijuana, and sentenced to youth detention. Joubert absconded from youth detention and failed to comply with his parole.

No. 24-70007

A few years later, Joubert was convicted of aggravated assault after he shot a man in the leg and was sentenced to four years' imprisonment. While in prison, Joubert was repeatedly disciplined for, among other things, fighting with other inmates and threatening to beat and rape correctional officers. About five years later, Joubert stole a car and assaulted the owner. That same month, Joubert was a passenger during a high-speed police chase where, after police stopped the vehicle, an officer discovered a pistol near where Joubert was reaching.

The following month, Joubert shot and killed one man, while a co-conspirator shot another man. Joubert repeatedly shot the victim until he had a fist-sized hole in his head. A few months later, Joubert was pulled over while driving intoxicated and in possession of marijuana and cocaine. The same month, Joubert participated in an armed robbery of a convenience store, where an employee was struck in the head with a gun. One month later, Joubert participated in the robbery-turned-murder that left Alfredia Jones and Officer Charles Clark dead.

The jury sentenced Joubert to death. His conviction and sentence were affirmed by the Texas Court of Criminal Appeals ("TCCA") on direct appeal in October 2007. *Joubert v. Texas*, 235 S.W.3d 729, 735 (Tex. Crim. App. 2007). During the pendency of his appeal, Joubert filed his initial state habeas application. The state habeas trial court recommended denying relief. The TCCA denied relief. *Ex parte Joubert (Ex parte Joubert I)*, No. WR–78,119–01, 2013 WL 5425127, at *1 (Tex. Crim. App. Sept. 25, 2013).

Nearly a decade after Joubert was convicted, new evidence came to light. Glaspie had testified against Brown in his separate trial, and Brown was convicted and sentenced to death in October 2005. But Brown had consistently maintained his innocence. In April 2013, newly discovered landline phone records tended to confirm Brown's alibi—that he was at his

girlfriend Ericka Dockery's apartment during the robbery. The TCCA vacated Brown's conviction and sentence because of the exculpatory evidence. *Ex parte Brown*, No. WR–68,876–01, 2014 WL 5745499, at *1 (Tex. Crim. App. Nov. 5, 2014). The Harris County District Attorney then dismissed Brown's charges. An investigation showed that the Assistant District Attorney who prosecuted Joubert knew about this evidence that tended to contradict Glaspie's testimony even before Joubert's trial in April 2003.

Joubert filed an initial federal habeas petition in September 2014, and an amended petition in May 2015. Joubert raised several claims for the first time in light of the new exculpatory evidence regarding Brown. The district court stayed the proceeding to permit Joubert to exhaust his new claims in state court. Joubert subsequently filed a second state habeas petition. The TCCA held that Joubert's second petition overcame the bar on subsequent applications for a writ of habeas corpus and remanded the case to the state habeas court. *Ex parte Joubert (Ex parte Joubert II)*, No. WR–78,119–02, 2016 WL 5820502, at *1 (Tex. Crim. App. Oct. 5, 2016). The state habeas trial court recommended that Joubert's conviction and sentence be vacated and the case remanded for a new trial as to both liability and punishment because the State (1) presented false evidence, and (2) withheld favorable material evidence given Glaspie's testimony about Brown's participation in the robbery during Joubert's trial. The TCCA disagreed and denied relief. It determined that (1) the false evidence was not material, and (2) the suppressed evidence was not material. *Ex parte Joubert (Ex parte Joubert III)*, No. WR–78,119–02, 2021 WL 2560170, *2 (Tex. Crim. App. June 23, 2021).

Joubert then filed a second amended petition in federal district court. In a comprehensive ninety-eight-page opinion, the district court denied Joubert's petition and did not issue a COA. *Joubert v. Lumpkin*, No. 13-cv-

No. 24-70007

3002, 2024 WL 4281444, *1 (S.D. Tex. Sept. 24, 2024) (Hittner, J.); Joubert's motion for a COA followed.

## II.

Joubert's habeas petition is subject to the strictures of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, Joubert must obtain a COA before he can appeal the district court's denial of habeas relief. 28 U.S.C. § 2253(c)(1).

To obtain a COA, Joubert must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as here, a district court rejects a constitutional claim on the merits, a COA will be granted only if the petitioner "demonstrate[s] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338, 123 S. Ct. 1029, 1040 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000)).

In determining whether the district court's denial of a prisoner's petition is debatable, this court "must be mindful of the deferential standard of review the district court applied to [Joubert's] claims as required by the AEDPA." *Miniel v. Cockrell*, 339 F.3d 331, 336 (5th Cir. 2003), *cert. denied sub nom. Miniel v. Dretke*, 540 U.S. 1179, 124 S. Ct. 1413 (2004). AEDPA requires the petitioner prove that the adjudication by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's

decision." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011) (internal quotation marks and citation omitted).

## III.

Joubert advances three claims he says warrant a COA: (1) the state unconstitutionally introduced Glaspie's false testimony regarding Brown in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173 (1959); (2) the state unconstitutionally suppressed evidence that contradicted Glaspie's testimony inculpating Brown in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); and (3) the state unconstitutionally "vouched" for Glaspie's credibility.

### A. *Napue* Claim

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269, 79 S. Ct. at 1177. To prove a *Napue* violation, Joubert must demonstrate that "(1) [a witness's] testimony was actually false, (2) the state knew it was false and (3) the testimony was material." *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir.) (citation omitted), *cert. denied*, 524 U.S. 933, 118 S. Ct. 2338 (1998).

Joubert asserts, and the State does not dispute, that the State knowingly elicited false testimony from Glaspie regarding Brown's involvement in the capital murder. Joubert also asserts that the State offered false testimony from Glaspie that his "testimony was entirely truthful." Based on these contentions, he argues that "Glaspie's false testimony was material to the jury's verdicts[.]"

The state habeas court agreed, but the TCCA did not; the TCCA rejected Joubert's *Napue* claim because Glaspie's false testimony was not material. It found that although "[t]he State now concedes that Glaspie

No. 24-70007

falsely testified at [Joubert's] trial about Brown's participation . . . it is not reasonably likely that Glaspie's false testimony about Brown's participation in the offense affected the judgment of the jury[.]" *Ex parte Joubert III*, 2021 WL 2560170, at *2.

The federal district court denied Joubert's petition for habeas relief. Joubert proposes several reasons in his motion for a COA why the district court erred. Contrary to Joubert's arguments, reasonable jurists would not debate the district court's conclusion that the TCCA's adjudication did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

First, the TCCA's judgment was not "contrary to . . . clearly established Federal law[.]" 28 U.S.C. § 2254(d)(1). When analyzing Joubert's *Napue* claim, the TCCA, in a parenthetical citation, articulated the relevant materiality standard: "false testimony is 'material' only if there is a 'reasonable likelihood' that it affected the judgment of the jury." *Ex parte Joubert III*, 2021 WL 2560170, at *2 (quoting *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014)). Joubert argues, and the district court agreed, that the exact formulation of the materiality standard asks whether "there is any reasonable likelihood that the false testimony *could have* affected the judgment of the jury." (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976))(emphasis added). The district court acknowledged the semantic difference but determined that the omission in the TCCA's standard was not contrary to federal law. The district court did not err.

A state court's decision is contrary to clearly established Federal law if it "applies a rule that contradicts the governing law set forth in [the Court's] cases" or if it "confronts a set of facts that are materially

indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S. Ct. 1495, 1519–20 (2000). Here, the TCCA first "identified the applicable Supreme Court precedent[]" by citing *Napue* and the relevant three-prong test. *Price v. Vincent*, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); *see Ex parte Joubert III*, 2021 WL 2560170, at *1–2 (citing *Napue*, 360 U.S. 264, 79 S. Ct. 1173). And the precedent the TCCA cited when discussing materiality similarly identified applicable Supreme Court precedent. *See Ex Parte Weinstein*, 421 S.W.3d at 665 n.25 (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 763 (1972)). Notwithstanding the TCCA's later characterization of the materiality standard, its identification of governing Supreme Court precedent is strong evidence that the TCCA's judgment does not contradict Federal law.

Recently, this court treated an identical standard articulated by the TCCA as the "traditional 'reasonable likelihood' test" equivalent to the standard articulated by *Napue* and not contrary to federal law. *Uvukansi v. Guerrero*, 126 F.4th 382, 390 (5th Cir. 2025). If there is any difference between the TCCA's standard and Supreme Court precedent, it is too small to be "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established federal law. *Williams*, 529 U.S. at 406, 120 S. Ct. at 1519. The TCCA's "shorthand reference to [the materiality] standard by use of the term ['affected'] without the modifier ['could have'] may perhaps be imprecise, but if so it can no more be considered a repudiation of the standard than can" this court's own "occasional indulgence in the same imprecision." *Woodford v. Visciotti*, 537 U.S. 19, 23–24, 123 S. Ct. 357, 359–60 (2002); *see, e.g.*, *Canales v. Stephens*, 765 F.3d 551, 574 (5th Cir. 2014) ("reasonable likelihood that the false testimony affected the judgment of the jury"). A contrary holding would constitute a "readiness to attribute error [] inconsistent with the

presumption that state courts know and follow the law." *Woodford*, 537 U.S. at 24, 123 S. Ct. at 360.

Second, reasonable jurists would not debate the district court's finding that the TCCA's judgment did not involve an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1). Under § 2254(d)(1)'s "unreasonable application" prong, the court may not "substitute[] its own judgment for that of the state court[.]" *Woodford*, 537 U.S. at 25, 123 S. Ct. at 360. As the *Woodford* Court explained:

> [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the governing legal principle] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [that principle] to the facts of his case in an objectively unreasonable manner. An *unreasonable* application of federal law is different from an *incorrect* application of federal law.

*Id*. at 24–25, 123 S. Ct. at 360 (internal quotation marks and citations omitted) (emphasis in original). The standard requires a petitioner to "show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118, 141 S. Ct. 517, 523 (2020) (internal quotation marks and citation omitted). "Rather, the relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was 'well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019) (en banc) (quoting *Shoop v. Hill*, 586 U.S. 45, 48, 139 S. Ct. 504, 506 (2019) (per curiam)) (emphasis in original), *cert. denied* 140 S. Ct. 2676 (2020).

Like the TCCA, the district court trained its attention on the materiality of the false testimony. *See Wilson v. Sellers*, 584 U.S. 122, 125, 138

S. Ct. 1188, 1192–93 (2018). The district court distinguished Joubert's case from Brown's, because (1) Brown's alibi evidence does not exculpate Joubert given Joubert's confession, and (2) the false information regarding Brown's participation in the robbery and murders came from both Glaspie and Joubert. The district court determined that "[f]rom the record, the [TCCA] was not unreasonable in finding no materiality in either phase of trial," because "Joubert has not shown that any false testimony about Brown's role in the crime influenced the jury's consideration[.]"

False testimony is material if it "may have had an effect on the outcome of the trial,"—that is, if it "in any reasonable likelihood [could] have affected the judgment of the jury[.]" *Napue*, 360 U.S. at 271–72, 79 S. Ct. at 1178–79. While false testimony that "goes only to the credibility of the witness" can be material, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* at 269, 79 S. Ct. at 1177 (first quote); *Agurs*, 427 U.S. at 109–10, 96 S. Ct. at 2400 (second quote). Materiality "depends almost entirely on the value of the evidence relative to the other evidence mustered by the State" at trial. *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir.) (citation omitted), *cert. denied*, 519 U.S. 1012, 117 S. Ct. 519 (1996). The ultimate issue is whether the excluded evidence can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995).

As to the guilt phase, reasonable jurists would not debate the district court's conclusion in light of Joubert's confession, "probably the most probative and damaging evidence that can be admitted against him." *Parker v. Randolph*, 442 U.S. 62, 72, 99 S. Ct. 2132, 2139 (1979) (plurality op.) (citation omitted). The jury could find Joubert guilty if (1) he was the triggerman who shot Jones, (2) he was a party to the murder or (3) he was a

No. 24-70007

co-conspirator to the murder. Under the third option, for example, the jury
was instructed that it could convict Joubert if it found that:

> the defendant entered into an agreement . . . to commit the
> felony offense of robbery . . . and pursuant to that agreement
> they did carry out their conspiracy, and while in the course of
> committing said conspiracy, Dashan Glaspie and/or Alfred
> Brown [*not* Joubert] . . . [shot Jones] and the murder of Alfredia
> Jones was committed in furtherance of the conspiracy and was
> an offense that should have been anticipated by the defendant
> as a result of carrying out the conspiracy[.]

Even in a counterfactual scenario, had the prosecutor corrected Glaspie's
false trial testimony, the jury could draw only two conclusions. First, the jury
could conclude that Brown was not present and therefore could not have shot
Officer Clark. But that has no bearing on Joubert's guilt. Second, the jury
could conclude Glaspie's testimony cannot be trusted because he lied about
Brown's involvement. But even if Glaspie was thoroughly impeached and
the jury did not credit *any* of his testimony, it would still be faced with
Joubert's *own* admission of guilt and his *own* statement that Brown was
involved. To be material, Glaspie's false testimony about Brown must have
caused the jury to overlook Joubert's own confession. There is no
"reasonable likelihood" of such an unreasonable result. *Napue*, 360 U.S. at
271, 72 S. Ct. at 1178.

The same analysis applies to the penalty phase. The jury answered
three special-issue questions at sentencing. It found that (1) "Joubert would
commit criminal acts of violence that would constitute a continuing threat to
society"; (2) Joubert either (a) actually caused the death of Jones or Clark, or
(b) did not cause the death of Jones or Clark but (i) intended to kill Jones or
Clark or (ii) anticipated that a human life would be taken; and (3) there were
not sufficient mitigating circumstances warranting a sentence of life
imprisonment rather than a death sentence considering "the circumstances

of the offense, the defendant's character and background, and the personal moral culpability of the defendant."

Any potential effect the false testimony regarding Brown may have had with respect to the penalty phase is muted in light of the total mix of evidence heard by the jury regarding Brown's role and Joubert's guilt. *Spence*, 80 F.3d at 995. The federal courts' limited role in habeas proceedings is to ensure only that a state court decision is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103, 131 S. Ct. at 786–87. We conclude that jurists of reason would not debate the district court's conclusion.

A contrary finding—that Glaspie's false testimony unrelated to Joubert's guilt was material at the penalty phase—would require piling inference upon inference inconsistent with AEDPA's unreasonable application provision. Because the identity of the third participant is ultimately irrelevant to Joubert's guilt, Joubert's materiality claim stems only from the potential effect that *correcting* Glaspie's false testimony might have had on his overall credibility. But while Glaspie and Joubert blamed each other for murdering Alfredia Jones, *both* of them blamed Brown for murdering Officer Clark. Joubert told the police: "[Brown] was already outside the door and shot [Officer Clark]. . . . [Brown] hit him." Had the prosecution corrected Glaspie's false testimony with facts exculpating Brown, the jury would be left with evidence that both Glaspie's testimony *and* Joubert's police statement were false. A conclusion that correcting Glaspie's testimony would lead the jury to discredit Glaspie's testimony but *not* equally discredit Joubert's statement makes no sense.

Moreover, notwithstanding the uncorrected false testimony, the jury already had strong reason to question Glaspie's veracity. Joubert's counsel

meticulously cross-examined Glaspie about his initial police statement and highlighted repeated lies. Counsel also highlighted Glaspie's incentive to "stay[] with th[e] script" he created with the assistance of his attorneys and investigating detectives approximately one year after the murders.

But even if Glaspie's credibility was eviscerated to the point that the jury did not believe Joubert murdered Jones, thus undermining the State's theory that Joubert murdered Jones, the State had other grounds for conviction. The prosecutor repeatedly told the jury that Joubert did not have to be the triggerman to be guilty of capital murder and be sentenced to capital punishment. Joubert said in his police statement that "if the laws come, she[Jones], she gonna die, I already knew this." The prosecutor reminded the jury during the penalty phase: "if you have a reasonable doubt as to whether or not he even is the shooter . . . . [h]e obviously did anticipate a human life would be taken."

Finally, the record reflects that Joubert was an exceptionally violent man with a long history of violent behavior. Indeed, he "committed another murder—the most powerful imaginable aggravating evidence." *Wong v. Belmontes*, 558 U.S. 15, 28, 130 S. Ct. 383, 391 (2009) (internal quotation marks and citation omitted). And Joubert's own admission that he knew a life would be taken was "probably the most probative and damaging evidence that can be admitted against him[.]" *Parker*, 442 U.S. at 72, 99 S. Ct. at 2139 (internal quotation marks and citation omitted).

Viewed in a vacuum, evidence that impeached Glaspie, the only witness who said Joubert shot Jones, could conceivably affect the jury's assessment of "the circumstances of the offense . . . and the personal moral culpability of the defendant." But materiality is analyzed in the context of all the information before the jury. From that perspective, and recognizing the federal courts' deferential review under AEDPA, reasonable jurists would

not debate the district court's conclusion that the TCCA did not unreasonably apply *Napue*.

Contrary to Joubert's contention, the Supreme Court's recent decision in *Glossip v. Oklahoma* casts no doubt on our conclusion. 604 U.S. ___, 145 S. Ct. 612 (2025). In *Glossip*, false testimony going to the credibility of a witness was material only because, unlike here, that witness's "testimony was the *only* direct evidence of [the defendant's] guilt of capital murder, [and therefore] the jury's assessment of [the witness's] credibility was necessarily determinative[.]" 145 S. Ct. at 628 (emphasis added). "[T]he jury could convict Glossip only if it believed [the witness]." *Id.* There was no confession by Glossip. Here, the jury could convict Joubert even if it discredited Glaspie's testimony; indeed, it could convict and sentence Joubert to death if Glaspie had not testified at all. That Joubert could be convicted and sentenced based almost entirely on his confession, together with corroborating eyewitness accounts, was clear to the jury.

Joubert's remaining *Napue*-related arguments do not warrant a COA.

Joubert argues, for a variety of reasons, that the TCCA and district court erred by failing to consider "Glaspie's testimony about the false guarantee of credibility in his plea agreement." Notwithstanding Joubert's technical legal arguments, his claim suffers from two fundamental flaws. First, the TCCA need not explain its decision in fulsome detail to be entitled to AEDPA deference. *See Harrington*, 562 U.S. at 98, 131 S. Ct. at 784. That it addressed only one part of Joubert's arguments or claims and discussed materiality generally is of no moment to applying AEDPA deference. *See Ex parte Joubert III*, 2021 WL 2560170, at *1–2. Second, the district court *did* address Glaspie's "false guarantee of credibility" argument and correctly rejected it because the relevant "testimony" was either not false, but rather Glaspie's own accurate recitation of his plea agreement, or not testimony,

but rather the prosecutor's statements to the jury. (State's opening argument); (direct examination of Glaspie); (State's closing argument); (citing (SHC finding "that ADA Rizzo's statements at trial vouching for the truth of Mr. Glaspie's testimony were false")). *See United States v. Valenica*, 600 F.3d 389, 410 (5th Cir.) ("[A]ttorneys' statements are not evidence[.]"), *cert. denied*, 562 U.S. 893, 131 S. Ct. 285 (2010). We now know, in light of Brown's innocence, that Glaspie was untruthful and violated his plea deal, and the prosecutor's reference to the plea deal's requirement of truthfulness was unethical. But that does not render Glaspie's accurate recitation of the terms of his plea deal false or transform the prosecutor's reference to the plea deal into testimony. Joubert's *Napue* claim does not merit a COA.

## B. *Brady* Claim

Mirroring his *Napue* claim, Joubert argues that the State suppressed material evidence of (1) telephone records corroborating grand jury testimony that supported Brown's alibi; (2) an email from an HPD Detective to the prosecutor informing him of the telephone records; and (3) the grand jury transcripts of witnesses who provided an alibi for Brown.

As the TCCA recognized, the "State does not contest that it suppressed favorable evidence," but the suppressed evidence "considered collectively and balanced against the evidence supporting [Joubert's] conviction" was not material because "the true identity of the third participant does not ultimately matter in light of [Joubert's confession]." *Ex Parte Joubert III*, 2021 WL 2560170, at *2. "For the same reasons" Joubert did not merit relief under *Napue*, the district court determined that there is no "reasonable probability that the result of the proceeding would have been different if the suppressed evidence had been disclosed to the defense."

Under *Brady*, "the State violates a defendant's right to due process if it [1] withholds evidence [2] that is favorable to the defense and [3] material

No. 24-70007

to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 630 (2012) (citation omitted). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

Among other complaints, Joubert claims the district court contravened *Wilson v. Sellers* by recognizing that the TCCA's decision was succinct and "did not fully divulge the path it took in deciding Joubert's claim" but nevertheless applying AEDPA deference. Under *Wilson*, a federal habeas court must "train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims." *Wilson*, 584 U.S. at 125, 138 S. Ct. at 1191–92 (internal quotation marks and citation omitted); *see also Wooten v. Lumpkin*, 113 F.4th 560, 567 (5th Cir. 2024). The parties' disagreements over the scope of alleged impeachment evidence in the record are ultimately beside the point. We train our attention, as the district court did, on the reason the TCCA rejected Joubert's claim—the undisclosed evidence was not material.

Joubert's *Brady* claim does not warrant a COA for essentially the same reasons Joubert's *Napue* claim does not warrant a COA. The undisclosed evidence was favorable to Joubert only insofar as it served to impeach Glaspie's testimony. *See Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999). Considering Joubert's confession, the cross-cutting effect of the impeachment evidence on Joubert's own credibility, the total mix of evidence before the jury, and the alternative grounds for conviction, reasonable jurists would not debate the district court's judgment that the TCCA's conclusion was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 103, 131 S. Ct. at 786–87.

Joubert's two additional *Brady*-related arguments do not warrant a COA.

First, Joubert takes issue with the district court's rejection of his grand jury testimony claims after it found that Joubert failed to prove the testimony was suppressed in state court. That testimony bore on Brown's alibi. Although the district court "summarily denie[d] Joubert's claim insofar as it involves the grand jury testimony" because Joubert "failed to prove suppression in state court," it held in the alternative that its materiality analysis "applies with full force to any grand jury testimony." Joubert does not contest the district court's alternate holding, which is independently sufficient to support its rejection of a *Brady* violation with respect to the grand jury testimony.

Second, Joubert contends that the TCCA and the district court erred by employing a sufficiency-of-the-evidence standard inconsistent with the *Brady* materiality analysis. The materiality inquiry "is not a sufficiency of evidence test," but rather turns on whether there is a "'reasonable probability' of a different result[.]" *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566. Nothing suggests the TCCA employed a sufficiency of the evidence test. Instead, the TCCA stated that "the suppressed evidence, considered collectively and balanced against the evidence supporting [Joubert's] conviction, is not material." *Ex Parte Joubert III*, 2021 WL 2560170, at *2 (citing *Kyles*, 514 U.S. 436, 115 S. Ct. at 1567). Similarly, the district court found that "the prosecution's case did not depend on proving that Joubert shot anyone" because "[t]he jury could convict Joubert as a party or conspirator" and "[t]he identity of the third robber did not matter under those theories[.]" And because "Joubert's own words fully inculpated him

as a party or conspirator," the TCCA's finding of immateriality was not unreasonable.

The district court's materiality analysis was proper. "[T]he materiality of *Brady* evidence depends almost entirely on the value of the evidence relative to the other evidence mustered by the State." *Spence*, 80 F.3d at 995 (citation omitted). "[W]ithheld evidence is more likely material when the State presents a weaker case[.]" *Floyd v. Vannoy*, 894 F.3d 143, 166 (5th Cir.) (per curiam) (citation omitted), *cert. denied*, 586 U.S. 1029, 139 S. Ct. 573 (2018). Conversely, withheld evidence is less likely material when "a substantial body of evidence establishing [the defendant's] guilt . . . is left unscathed by the suppressed evidence." *United States v. Miller*, 520 F.3d 504, 515 (5th Cir.), *cert. denied*, 555 U.S. 876, 129 S. Ct. 185 (2008). "In assessing the materiality of undisclosed impeachment evidence, 'we must consider the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony.'" *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994) (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989)), *cert. denied*, 513 U.S. 1091, 115 S. Ct. 754 (1995).

The district court therefore considered the strength of the State's case as well as the total mix of evidence when reaching its conclusion. It recognized the "substantial body of evidence" establishing Joubert's guilt, including his own confession, was "left unscathed by the suppressed evidence." *Miller*, 520 F.3d at 515. Far from a sufficiency of the evidence standard, the district court considered the effect of the suppressed evidence in light of the State's other evidence adduced at trial and the avenues through which the jury could have reached its outcome and reasonably concluded that the otherwise cumulative evidence that impeached Glaspie was immaterial in light of the entire evidentiary record. Joubert's *Brady* claim does not merit a COA.

No. 24-70007

## C. Prosecutorial Vouching Claim

Joubert's third contention is that the prosecutor impermissibly "vouched" for the credibility of Glaspie at trial.[1] The TCCA did not directly address Joubert's "vouching" claim. Instead, it simply "den[ied] relief" on Claim One. *Ex Parte Joubert III*, 2021 WL 2560170, at *2.

The district court first noted that Joubert's claim was likely not exhausted but nevertheless rejected Joubert's claim on the merits. Even if Joubert properly raised his claim before the TCCA, it fails on the merits. The district court catalogued the prosecutor's comments to the jury and determined that they did not rise to a level sufficient to unconstitutionally taint the trial. Joubert argues the district court erred when it found that "[t]he record does not suggest that the prosecutor's statements crossed a line which tried to take any responsibility from the jurors." It did not.

During opening statement, the prosecutor stated: "You're going to also hear that part of [Glaspie's] deal is that he has to testify truthfully . . . if he lies about anything . . . we prosecute him [] for capital murder." Although the prosecutor noted the deal was "a big hammer over [Glaspie's] head to testify truthfully," he stated: "Do I know that [Glaspie's] going to testify truthfully? No. That's going to be your – your job to figure out."

During the direct examination of Glaspie, he, not the prosecutor, accurately explained his deal. Glaspie explained the terms of his deal to the jury: "[The deal] means I have to tell the truth about my role or any other role that's in this case and what happened. . . .   [I]f I lie about

---

[1] This claim is almost surely unexhausted and procedurally defaulted, inasmuch as Joubert raised the prosecutor's vouching only, and incorrectly, within his claim against false testimony offered by Glaspie. The argument that he now makes relates to prosecutorial misconduct in argument to the jury. Be that as it may, we and the district court concur in finding it meritless.

anything . . . then I'd be prosecuted for capital murder." The prosecutor asked Glaspie: "[W]here are we going to determine whether or not you're lying or not [sic]? I mean, is it – is it just coming from my opinion or where is it coming from?" Glaspie replied: "No, it's coming from my word and based on the evidence, what they have."

During closing argument, the prosecutor stated that Glaspie was telling the truth, but largely in the context of the prosecutor's argument that Glaspie was truthful because his story aligned with other evidence. The prosecutor twice told the jury that Glaspie was truthful when testifying. Both times, Joubert's counsel objected to the prosecutor's assertion and stopped the prosecutor in mid-sentence before he could complete the reason for claiming Glaspie testified truthfully.[2] Both were made in the context of the prosecutor's broader argument that the evidence adduced at trial, including Glaspie's testimony, supported Joubert's guilt. The prosecutor went on to state: "[T]he reason that Glaspie was telling the truth based upon all the evidence is because it matches each and every small piece of evidence, is what it does. And, also, the demeanor of him testifying." The prosecutor then noted, "we did not need [Glaspie] . . . to prove this case . . . . We had [Joubert] guilty as a co-conspirator. . . . But what we did need [Glaspie] for was we did need him to show each and every piece [of evidence], to show what all of this means. . . . All of the little details that a juror is entitled to know in a capital murder case."

---

[2] The first time, the prosecutor stated: "Glaspie told the truth when he testified. And he had a good reason to." Defense counsel then objected to the prosecutor's statements, which was overruled. The second time, the prosecutor stated: "Glaspie was telling the truth. And the reason—[.]" Defense counsel again interrupted by saying that the prosecutor was "putting his own credibility behind any witness' testimony as being credible[,]" which was overruled.

No. 24-70007

The prosecutor's statements did not render the trial constitutionally infirm. "In order for a state habeas petitioner to prevail on a claim that an improper jury argument marred his trial the asserted error must be one of constitutional magnitude. This means that the prosecutorial remarks must be so prejudicial that they render the trial fundamentally unfair." *Houston v. Estelle*, 569 F.2d 372, 377 n.8 (5th Cir. 1978). "Improper prosecutorial remarks are constitutionally unfair only if they are persistent and pronounced, or if the evidence is so weak that no conviction would have occurred but for the remarks." *Woodfox v. Cain*, 609 F.3d 774, 806 (5th Cir. 2010). The relevant inquiry generally turns on three factors: "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999) (citations omitted).

Joubert points to two isolated statements by the prosecutor during closing argument in a forty-five volume trial transcript that spans over eight thousand pages. Both were made in the context of the State's effort to add credibility to Glaspie's testimony by placing it in the context of other evidence adduced at trial and were unadorned by explanation only because defense counsel interrupted to object to the prosecutor's statement. Both statements were made after the prosecutor told the jury, "[d]o I know that [Glaspie's] going to testify truthfully? No. That's going to be your – your job to figure out," and while the prosecutor told the jury "we did not need [Glaspie] . . . to prove this case" because Joubert is guilty as a co-conspirator. The trial court instructed the jurors that they "are the exclusive judges . . . of the credibility of the witnesses and the weight to be given their testimony[.]" *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 1709 (1987) ("[J]uries are presumed to follow their instructions[.]"). And the evidence inculpating Joubert, most notably his own confession, was virtually

insurmountable. The State's case was not weak. No reasonable jurist would debate the district court's rejection of Joubert's prosecutorial vouching claim because the prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974).

Joubert argues in his motion for a COA that the district court erred by not considering the prosecutor's elicitation of Glaspie's testimony as relevant to the prosecutorial vouching analysis. But a prosecutorial vouching claim does not turn on the prosecutor's elicitation of testimony but rather on the prosecutor's *own* statements to the jury, which "carr[y] with [them] the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19, 105 S. Ct. 1038, 1048 (1985). The prosecutor's knowing presentation of false testimony bears on Joubert's *Napue* claim addressed *supra* at 8–17, not his prosecutorial vouching claim. Joubert's vouching claim, properly framed, does not merit a COA.

## IV.

No reasonable jurist would debate or disagree with the district court's rejection of Joubert's (1) *Napue* claim, (2) *Brady* claim, and (3) prosecutorial vouching claim. Accordingly, Joubert's application for a COA is DENIED.